## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ISAAC A. MILLER, | : | |
| | : | |
| Plaintiff, | : | No. 3:19-cv-01775 |
| | : | |
| v. | : | (Saporito, M.J.) |
| | : | |
| ANDREW SAUL, | : | |
| Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant. | : | |

## <u>MEMORANDUM</u>

This is an action brought under 42 U.S.C. §405(g), seeking judicial review of the Commissioner of Social Security's ("Commissioner") final decision denying Isaac A. Miller's ("Miller") claim for supplemental security income under Title XVI of the Social Security Act. This matter has been referred to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 9, Doc. 10, Doc. 11). For the reasons stated herein, we will **AFFIRM** the decision of the Commissioner.

## I.    *Background and Procedural History*

Miller is an adult individual born July 5, 1999, who was 14 years old at the time of his alleged onset date of disability—April 22, 2013. (Tr. 217). Miller's age at the onset date makes him a "younger person" under the Social Security Act. *See* 20 C.F.R. § 404.1563(c). Miller is a high school graduate and attended special education courses while in school. (Tr. 52). Beyond serving as a dishwasher at the Blue Mountain Retreat for approximately two weeks, Miller has never worked. (Tr. 56-57). Thus, Miller has no past relevant work experience.[1] (Tr. 24).

Miller is an individual who received supplemental security income benefits based on disability as a child. (Tr. 20). Miller alleged disability due to experiencing difficulty understanding direction, reading and writing, staying on task, attention deficit hyperactivity disorder ("ADHD"), receiving learning support since kindergarten; and getting upset when he cannot perform certain tasks. (Tr. 220). As required by law, eligibility for these disability benefits were redetermined under the rules for determining disability in adults when the claimant turns 18,

---

[1] Past relevant work is defined as work that a claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560.

and on November 20, 2017, it was determined that Miller was no longer disabled as of November 1, 2017. (*Id.*). This determination was upheld upon reconsideration after a disability hearing by a State agency Disability Hearing Officer. (*Id.*). Thereafter, Miller filed a written request for an administrative hearing on July 30, 2018. (*Id.*). Miller, represented by counsel, appeared and testified before Administrative Law Judge, Mike Oleyar (the "ALJ"), on January 3, 2019, in Wilkes Barre, Pennsylvania. (Tr. 12, 47). In addition, an impartial vocational expert ("VE"), Josephine Doherty, and Miller's mother, Margaret Miller, also appeared and testified during the administrative hearing. (Tr. 47). At the time of the hearing, Miller was 19 years old and resided with his family in New Ringgold, Pennsylvania, which is in the Middle District of Pennsylvania. (Tr. 52).

In a written decision dated February 13, 2019, the ALJ denied Miller's application for benefits. (Tr. 9, 12). Miller sought further review of his claim by the Appeals Council of the Office of Disability Adjudication and Review, but his request was denied for review on August 12, 2019. (Tr. 1). Miller subsequently filed an appeal to the this Court on October 11, 2019, arguing that the ALJ's decision was not supported by

substantial evidence. (Doc. 1). On December 11, 2019, the Commissioner filed his answer, in which he maintains that the ALJ's decision was correct and in accordance with the law and regulations. (Doc. 7, at 3).

On this score, Miller's treatment history demonstrates that he has ADHD, selective mutism, autism, and a learning disability. (Tr. 20, 417-418). Miller alleges that these conditions affect his ability to retain information, complete tasks, concentrate, understand, follow instructions, and get along with others. (Tr. 395). In August 2013, Miller underwent a Wechsler Children Intelligence Scale-IV test administered by consultative examiner, Dr. David O'Connell ("Dr. O'Connell"). (Tr. 508-12). The test revealed that Miller had an IQ score of 66, which placed him in the mildly mental retardation range of mental abilities. (Tr. 510-511). In March 2018, however, Miller was administered the Wechsler Adult Intelligence Scale – IV test and received an IQ score of 74, a verbal comprehension score of 72, a perceptual reasoning score of 82, a working memory score of 74, and a processing speed score of 84. (Tr. 626-27). Miller's full-scale IQ and verbal comprehension score placed him in the borderline range and the other scores were in the low average range. (Tr. 626).

Additionally, throughout his schooling, Miller received an individualized education plan ("IEP") for special education services. (Tr. 290-94). Because of his learning disability, Miller participated in group education and his teachers read his tests to him upon request, as he experienced difficulties in the areas of basic reading skills, reading comprehension, spelling and written expression, math calculations, and math reasoning. (Tr. 290-94). Despite his disability, Miller maintained good relationships with his teachers and peers, and was involved in cross country kayaking while in school . (Tr. 520). Further, throughout his education, Miller attended 60 percent general education classes and successfully graduated high school. (Tr. 20).

With regard to Miller's mental status examinations, the medical record revealed that the findings were unremarkable. (Tr. 581, 657, 840). For example, upon examination, Miller was noted as pleasant, polite, and cooperative; his mood was euthymic; he exhibited no thought or perceptual disturbances; his recent and remote memory was intact; his concentration was adequate; his general fund of knowledge was normal; and his ADHD symptoms were managed and stable with medication adherence. (Tr. 581, 657, 840). The record reflected, however, that at

times Miller exhibited abnormal social interactions with impaired memory, which was treated by medication. (Tr. 657).

In November 2017, Miller was examined by consultative examiner, Dr. Angela Chiodo ("Dr. Chiodo"). (Tr. 601-05). Dr. Chiodo opined that Miller had marked limitations in carrying out complex instructions and making judgments on decisions; moderate limitations on understanding and remembering complex instructions; and mild limitations on making judgments on simple decisions. (Tr. 606-08). Additionally, Dr. Chiodo opined that Miller had no limitations with regard to understanding, remembering, or carrying out simple instructions; and although he had moderate limitations in the area of interacting appropriately with the public, Miller's limitations were mild with respect to coworkers and supervisors. (Tr. 606-07).

Also, in November 2017, Miller was examined by Dr. Soraya Amanullah ("Dr. Amanullah"), State agency mental health consultant. (Tr. 100-01). Dr. Amanullah opined that Miller's mental health conditions were severe. (Tr. 100). With regard to the "paragraph B" criteria, Dr. Amanullah found that Miller's understanding, remembering, or applying information was mildly restricted; that he was

moderately restricted with respect to interacting with others; that he was moderately restricted in terms of concentration, persistence, or pace; and that he was mildly restricted with regard to adapting or managing oneself. (Tr. 101).

In March 2018, Miller was examined by Dr. Stephanie Adam ("Dr. Adam"). (Tr. 624-27). Dr. Adam opined that Miller had moderate limitations with regard to understanding, remembering, or carrying out simple instructions and making simple work-related decisions. (Tr. 628). Dr. Adam also opined that Miller had moderate limitations with respect to understanding, remembering, or carrying out complex instructions and making complex work-related decisions. (Tr. 628-630). Further, Dr. Adam opined that Miller had moderate limitations in the area of interacting appropriately with the public, coworkers, and supervisors; and marked limitations with regard to responding appropriately to usual work situations and routine work settings. (Tr. 628-29).

In January 2018, Miller's special education teacher, Ms. Sherri Gerber ("Ms. Gerber"), completed a teacher questionnaire form. (Tr. 425-429). In the questionnaire form, Ms. Gerber indicated that Miller had some slight to serious difficulties with acquiring and using information,

such as reading and comprehending written material and math problems; that he had slight difficulties with carrying out multistep instructions and working accurately without careless mistakes; and that he experienced difficulties working at a reasonable pace and finishing on time. (Tr. 425-26). Ms. Gerber further indicated that Miller had no limitations in the area of interacting and relating with others; no limitations with regard to moving about and manipulating objects; no limitations in the area of caring for himself; and no physical health impairments that she was aware of. (Tr. 427-29).

Moreover, in March 2018, Dr. Richard Small ("Dr. Small") completed a Mental Residual Functional Capacity Assessment form. (Tr. 631-33). In the form, Dr. Small opined that Miller had some moderate limitations in the following areas: remembering, carrying out, and understanding detailed instructions; social interaction; and adaptation. (Tr. 631-32).

In May 2018, Miller injured his right knee while playing basketball. (Tr. 731). Miller's injury resulted in a tear to his right ACL. (Tr. 743). Thus, in June 2018, Miller underwent arthroscopic reconstruction surgery. (*Id.*). After his surgery, Miller was treated with physical

therapy, and by August 2018, Miller reported that he was training to run a half marathon with no increased symptoms. (Tr. 15). In September 2018, Miller reached his maximal functional level and was discharged from physical therapy. (Tr. 814, 819).

As for his daily activities, Miller testified and reported that he cared for most of his personal needs, prepared light meals, and performed household chores—all of which he completed with the assistance of his mother. (Tr. 391-93). Miller further reported that he watched television with his sister, shopped in stores, cared for his family dog, played baseball and football, trained for a 5k marathon, listened to music, participated in Boy Scouts, and went to church because he was the altar boy. (Tr. 391-395, 811). Miller reported, however, that he was unable to count change, pay bills, handle a savings account, and use a checkbook because he struggles with math and gets nervous and confused. (Tr. 393).

## II.   *Legal Standards*

When reviewing the denial of disability benefits, the Court's review is limited to determining whether those findings are supported by substantial evidence in the administrative record. *See* 42 U.S.C. § 405(g) (sentence five); *Id.* § 1383(c)(3); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d

198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The question before the Court, therefore, is not whether the claimant is disabled, but whether the Commissioner's finding that he or she is not

- 10 -

disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The [Commissioner]'s determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

To receive disability benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a); *Id.* § 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment[2] that makes it impossible to do his or her

---

[2] A "physical or mental impairment" is an impairment resulting from

previous work or any other substantial gainful activity[3] that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); *Id.* § 1382c(a)(3)(B); 20 C.F.R. § 404.1505(a); *Id.* § 416.905(a).

The Commissioner follows a five-step sequential evaluation process in determining whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a); *Id.* § 416.920(a). Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment;[4] (4) whether the claimant is able to do past relevant work, considering his or her residual functional capacity ("RFC");[5] and (5) whether the claimant is able to do any other work,

---

"anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3); *Id.* § 1382c(a)(3)(D).

[3] "Substantial gainful activity" is work that (1) involves performing significant or productive physical or mental duties, and (2) is done (or intended) for pay or profit. 20 C.F.R. § 404.1510; *id.* § 416.910.

[4] An extensive list of impairments that warrant a finding of disability based solely on medical criteria, without considering vocational criteria, is set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1.

[5] "Residual functional capacity" is the most a claimant can do in a work setting despite the physical and mental limitations of his or her impairment(s) and any related symptoms (e.g., pain). 20 C.F.R. § 404.1545(a)(1); *id.* § 416.945(a)(1). In assessing a claimant's RFC, the

considering his or her RFC, age, education, and work experience. *Id.* § 404.1520(a); *Id.* § 416.920(a). The claimant bears the initial burden of demonstrating a medically determinable impairment that prevents him or her from doing past relevant work. 42 U.S.C. § 423(d)(5); *Id.* § 1382c(a)(3)(H)(i); 20 C.F.R. § 404.1512; *Id.* § 416.912; *Mason*, 994 F.2d at 1064. Once the claimant has established at step four that he or she cannot do past relevant work, the burden then shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform consistent with his or her RFC, age, education, and past work experience. 20 C.F.R. § 404.1512(f); *Id.* § 416.912(f); *Mason*, 994 F.2d at 1064.

## III. Discussion

As mentioned above, Miller received supplemental security income benefits based on disability as a child. (Tr. 12). Eligibility for these disability benefits, however, must be redetermined by the Commissioner under the rules for determining disability in adults when the claimant turns 18. *See* 42 U.S.C. § 1382(c). As such, on November 20, 2017, it was

---

Commissioner considers all medically determinable impairments, including those that are not severe. *Id.* § 404.1545(a)(2); *id.* § 416.945(a)(2).

determined that Miller was no longer disabled as of November 1, 2017. (Tr. 12). This determination was upheld upon reconsideration after a disability hearing by a State agency Disability Hearing Officer. (*Id*.). Thereafter, Miller filed a written request for an administrative hearing. (*Id*.).

In his February 2019 decision, however, the ALJ denied Miller's claim for benefits. (Tr. 9-26). The ALJ evaluated Miller's application for benefits at each step of the sequential evaluation process. (Tr. 14-24). While the ALJ did not make a finding as to whether Miller had engaged in substantial gainful activity at step one, it is undisputed that Miller has never worked. (Tr. 24, 56-57). At step two, the ALJ found that since November 1, 2017, Miller had the following medically determinable and severe impairments: ADHD, borderline intellectual functioning, learning disorder, social anxiety disorder, and autism spectrum disorder. (Tr. 14).

At step three, the ALJ found that since November 1, 2017, Miller did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, during the relevant period. (Tr. 15-19).

Between steps three and four, the ALJ fashioned an RFC considering Miller's limitations from his impairments:

> After careful consideration of the entire record, the undersigned finds that since November 1, 2017, [Miller] has had the [RFC] to perform a full range of work at all exertional levels, but with the following non-exertional limitations: simple, routine tasks, but not at a production line pace (such as assembly line work); simple work related decisions with occasional changes in the work setting; occasional interaction with supervisors, coworkers, and never public interactions; and no tandem or group tasks with coworkers. In addition, [Miller] is limited to instructions that are oral and not written.

(Tr. 19).

At step four, the ALJ found that Miller had no past relevant work. (Tr. 24). At step five, the ALJ determined that based on Miller's age, education, work experience, and RFC that there were a significant number of jobs in the national economy that he could perform, including working as a vehicle cleaner, janitor, and laundry attendant. (Tr. 25).

Miller contends that the decision of the ALJ is not supported by substantial evidence of record and raises three issues on appeal attacking various aspects of the ALJ's decision. We shall address each argument seriatim.

### A. The ALJ's Step Two Evaluation is Supported by Substantial Evidence and Any Alleged Error is Harmless on These Facts

Miller's first claim of error, challenges the ALJ's step two evaluation. (Doc. 12, at 3-4). Specifically, Miller argues that the ALJ erred in failing to find his headache disorder and right knee injury resulting in ACL reconstruction a severe impairment. (Doc. 12, at 3). With regard to his headache disorder, Miller contends that the medical record demonstrates that he had approximately 24 significant migraines with seven out of ten pain in only a three-month time frame. (*Id.*). Miller further contends that he sought medical treatment with a neurologist for this disorder who was attempting to manage the disorder medically. (Doc. 12, at 3-4). Thus, Miller argues that his headache disorder and right knee injury resulting in ACL reconstruction should have been considered a severe impairment because it causes more than a minimal effect on his ability to meet the basic demands of work activity. (*Id.*).

In response, the Commissioner argues that the ALJ thoroughly explained the legal and factual basis in support of his findings concerning severity at step two, and that the ALJ's step two evaluation is supported by substantial evidence. (Doc. 13, at 9-13).

At step two of the sequential evaluation process, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). An impairment is considered severe if it "significantly limits an individual's physical or mental abilities to do basic work activities." 20 C.F.R. 404.1520(c). An impairment is severe if it is "something beyond a 'slight abnormality' which would have no more than a minimal effect on the Plaintiff's ability to do basic work activities." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d at 357, 360 (3d Cir. 2004) (quoting SSR 85-28, 1985 WL 56856 (1985)). The Court of Appeals is clear that the step-two inquiry is a de minimis screening device used to cast out meritless claims. *McCrea*, 370 F.3d at 360; *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). The burden is on the claimant to show that an impairment qualifies as severe. *Bowen*, 482 U.S. at 146.

Here, we find that substantial evidence supports the ALJ's step two evaluation. At step two, the ALJ considered all of Miller's alleged impairments, including his ADHD, selective mutism, autism, and learning disability. (Tr. 220, 417-18). The ALJ also considered Miller's tension headaches and status post right knee ACL reconstruction. (Tr.

14). The ALJ concluded, however, that during the relevant period, Miller had the following severe impairments: ADHD, borderline intellectual functioning, learning disorder, social anxiety disorder, and autism spectrum disorder. (Tr. 14). The ALJ then went on to conclude that Miller had three nonsevere impairments, including allergic rhinitis, status post right knee ACL reconstruction, and tension headaches. (*Id*.). In forming this determination, the ALJ considered Miller's treatment records and testimony concerning his activities of daily living, which demonstrated that Miller's status post right knee ACL reconstruction, allergic rhinitis, and tension headaches did not result in more than a minimal impairment on his ability to perform work-related activities. (*Id*.).

With regard to Miller's status post right knee ACL reconstruction, the ALJ explained that Miller injured his right knee playing basketball and underwent reconstruction surgery in June 2018. (Tr. 14-15). After his surgery, however, the ALJ explained that Miller was treated with physical therapy with significantly decreased pain. (Tr. 15). Further, in August 2018, Miller reported that he had been training to run a half marathon with no increased symptoms, and in September 2018, he reported that he reached his maximal functional level and was

discharged from physical therapy. (Tr. 814, 819). Thus, the ALJ concluded that Miller's status post right knee ACL reconstruction was a nonsevere impairment.

As for his tension headaches, the ALJ explained that while Miller testified to experiencing headaches twice a day, an MRI of his brain in July 2018, demonstrated no abnormalities. (Tr. 15, 829). Additionally, the ALJ explained that Miller was treated by a neurologist who recommended healthier lifestyle habits, and Miller testified that he took medications and laid down for relief. (Tr. 15, 53, 841). The ALJ further explained that the record contained no evidence of recommended or anticipated treatment, such as ongoing treatment by the neurologist to treat his tension headaches. (Tr. 15). Thus, his tension headaches were being managed medically, and were amenable to proper control by adherence to recommended medical compliance. (*Id*.). Accordingly, the ALJ concluded that Miller's tension headaches were nonsevere impairments.

Miller argues that the ALJ erred in failing to find his status post right knee ACL reconstruction and tension headaches severe impairments. (Doc. 12, at 1-2). However, the ALJ adequately explained

the legal and factual basis for his step two evaluation, which we find was supported by substantial evidence. Further, at no point in the record does Miller identify any medical evidence that the ALJ failed to consider concerning his right knee ACL reconstruction and tension headaches. Moreover, even assuming that the ALJ erred in finding Miller's right knee ACL reconstruction and tension headaches nonsevere impairments, any error is harmless. Read as a whole and in a commonsense fashion, it is clear that the ALJ's decision considered these impairments throughout the sequential evaluation process and incorporated them into the RFC, restricting Miller to a full range of work at all exertional levels and incorporating additional functional limitations to adequately address his medical impairments. Thus, the Court finds no basis for disturbing the ALJ's determination as to this issue.

### B. Substantial Evidence Supports the ALJ's Step Three Evaluation

Miller's next claim of error, challenges the ALJ's step three evaluation. (Doc. 12, at 4-8). Specifically, Miller argues that the ALJ erroneously concluded, at step three, that his impairments individually or collectively, did not meet or medically equal listing 12.05 (Intellectual disorder). Contrary to the ALJ's findings, Miller contends that the

medical record contains evidentiary support, which suggests that he has a significant intellectual disability pursuant to listing 12.05. (Doc. 12, at 5). Miller argues:

> [Claimant] underwent IQ testing revealing a valid IQ of 66. (Exhibit 4F, TR pp 508-512) Of course[,] Listing 12.05 would require a full scale or comparable IQ score of less than 70. As such, the IQ score at Exhibit 4F fulfills 12.05B(1)(a). Furthermore, Claimant's [m]other testified that he has significant intellectual difficulties that would result in marked or extreme limitations in his ability to understand, remember or apply information, interact with others, concentrate or maintain pace and/or adapt or manage to oneself. Furthermore, a [c]onsultative [e]xamination [r]eport at 8F found Claimant had marked limitations in his ability to carry out complex instructions and make judgments on decisions. (TR pp 600-608). Additionally, a separate [c]onsultative [e]xamination found Claimant to have marked limitations with responding appropriately to usual work situations and routine work settings. (Exhibit 13F, TR pp 621-630).

(Doc. 12, at 5). Miller argues that these findings were more than sufficient for the ALJ to find medical equivalency to listing 12.05. (Doc. 12, at 5).

In response, the Commissioner argues that the ALJ considered Miller's impairments under listing 12.05. (Doc. 13, at 15). The Commissioner contends, however, that Miller did not meet his burden of

offering evidence that satisfied all of the criteria for a listed impairment.
(*Id.*).

It is the responsibility of the ALJ to identify the relevant listed impairments given "the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000). If a claimant's impairment meets or equals one of the listed impairments, a claimant is per se disabled under the regulations. 20 C.F.R. § 404.1520(d); *Burnett*, 220 F.3d at 119. However, to qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, the claimant bears the burden of presenting "medical findings equivalent in severity to all the criteria for the one most similar impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis in original); 20 C.F.R. § 404.1520(d). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. *Zebley*, 493 U.S. at 521.

In this case, viewing the record as a whole, the Court finds that the ALJ's step-three determination is supported by substantial evidence.

### 1. Listing 12.05

Here, Miller argues that his impairments meet or medically equal listing 12.05. In pertinent part, listing 12.05 requires a claimant to meet Section A or B of the listing criteria. 20 C.F.R. Part 404, Subpt P, App. 1 § 12.05A, 12.05B. Section 12.05A is satisfied by demonstrating the following: (1) significantly subaverage general intellectual functioning evident in a claimant's cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; (2) significant deficits in adaptive functioning currently manifested by a claimant's dependence upon others for personal needs (i.e., toileting, eating, dressing, or bathing); and (3) evidence with regard to the claimant's disorder, which demonstrates or supports the conclusion that the claimant's disorder began prior to the claimant turning 22. 20 C.F.R. Part 404, Subpt P, App. 1 § 12.05A.

Section 12.05B is satisfied by meeting paragraph one, two, and three. 20 C.F.R. Part 404, Subpt P, App. 1 § 12.05B. Specifically, paragraph one requires significantly subaverage general intellectual functioning evidenced by: (a) a full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general

intelligence; or (b) a full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence. 20 C.F.R. Part 404, Subpt P, App. 1 § 12.05B(1)(a)-(b).

Paragraph two requires evidence of significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (a) understand, remember, or apply information; (b) interact with others; (c) concentrate, persist, or maintain pace; or (d) adapt or manage oneself. 20 C.F.R. Part 404, Subpt P, App. 1 § 12.05B(2)(a)-(d).

Lastly, paragraph three requires evidence concerning the current intellectual, adaptive functioning, and history of a claimant's disorder demonstrating or supporting the conclusion that the claimant's disorder began prior to the claimant turning 22. 20 C.F.R. Part 404, Subpt P, App. 1 § 12.05B(3).

Here, the ALJ concluded that Miller's medical impairments did not meet listing 12.05 or any other relevant listings for mental disorders, including listing 12.04 (Depressive, bipolar, and related disorders),

listing 12.06 (Anxiety disorders), listing 12.10 (Autism spectrum disorder), and listing 12.11 (Neurodevelopmental disorders). In making this finding, the ALJ first considered the four broad functional areas set forth in the "paragraph B" criteria, which is used in evaluating mental disorders. (Tr. 15).

To satisfy the "paragraph B" criteria, a claimant's mental impairments must result in at least one extreme or two marked limitations in the following broad areas of functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing themselves. (Tr. 16). A marked limitation means functioning in an area independently, appropriately, effectively, and on a sustained basis is seriously limited. (Tr. 16). An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. (*Id*.).

In the present case, the ALJ concluded that Miller had moderate limitations in all four areas of functioning, including (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or

managing oneself. (Tr. 16). In support of his determination, the ALJ explained that despite receiving an IQ score of 66 in August 2013, which placed Miller in the mildly mental retardation range of mental abilities, later in March 2018, Miller received an IQ score of 74. (Tr. 16). Thus, Miller's later score failed to meet the requisite IQ score of 70 or below pursuant to the criteria set forth in listing 12.05. (*Id.*).

Additionally, the ALJ noted other reasons why Miller's medical impairments failed to meet or medically equal the criteria for a listed impairment.  For example, the ALJ explained that Miller successfully completed high school with supportive services; that he attended 60 percent of his classes in general education; that he did not need speech therapy; and that he was described as cooperative and friendly at school. (*Id.*). The ALJ also considered Miller's mental status examinations and found that based upon the record, Miller's concentration and attention was generally intact and that he did not experience difficulties with his concentration with regard to preferred activities (i.e., video games, television programs, and movies); that he could perform simple math calculations and count to twenty by twos; that while his knowledge and memory were impaired, his thought process and thought content were

appropriate without psychosis; and that the record lacked evidence of school-based therapy, psychiatric treatment, emergency room visits, or hospitalizations that demonstrated uncontrolled symptoms. (*Id.*).

With regard to whether Miller's medical impairments satisfied Section A or B of listing 12.05, the ALJ concluded that they did not. Again, the ALJ explained that while Miller received an IQ score of 66 as a child in August 2013, his later IQ score of 74 in March 2018, demonstrated scores that fell outside the range required under listing 12.05. (*Id.*). Moreover, the ALJ explained that while Miller alleges that his conditions are medically equivalent to listing 12.05, the record contains no evidence of a medical opinion indicating that Miller's medical impairments are equivalent to listing 12.05 or any other listing. (*Id.*).

Therefore, because the ALJ's step three evaluation is supported by substantial evidence, the Court finds no reason to disturb the ALJ's decision as to this issue.

### C. Substantial Evidence Supports the ALJ's Decision

In his last assignment of error, Miller argues that because the ALJ erred on all of the issues mentioned above, the ALJ's decision is not supported by substantial evidence. As explained in our decision above,

we find that the ALJ's assessment of the evidence in this case complied with the dictates of the law and thus, was supported by substantial evidence.

To reiterate, this Court is not now tasked with revisiting these factual issues, and we may not substitute our judgment for that of the ALJ. Instead, we are limited to determining whether the ALJ provided valid reasons for his evaluations and based his conclusions on substantial evidence. Thus, finding that the ALJ provided adequate articulation for these determinations which are grounded in substantial evidence, the Court finds no basis for disturbing the ALJ's determination on this matter.

An appropriate Order follows.

Dated: December 4, 2020                *s/Joseph F. Saporito, Jr.*
                                       JOSEPH F. SAPORITO, JR.
                                       United States Magistrate Judge